UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | CHRISTOPHER SNYDER, Individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | ) ) ) ) ) ) CASE NO. |
| | Plaintiff, | ) ) |
| vs. | | ) ) |
| 1. | AUBREY K. McCLENDON, | ) |
| 2. | RICHARD K. DAVIDSON, | ) |
| 3. | KATHLEEN M. EISBRENNER, | ) |
| 4. | V. BURNS HARGIS, | ) |
| 5. | FRANK KEATING, | ) |
| 6. | CHARLES T. MAXWELL, | ) |
| 7. | MERRILL A. MILLER, JR., | ) |
| 8. | DON L. NICKLES, and | ) |
| 9. | LOU SIMPSON, | ) |
| | Defendants, | ) ) |
| | --and-- | ) ) |
| 10. | CHESAPEAKE ENERGY CORPORATION, an Oklahoma Corporation, | ) ) ) ) |
| | Nominal Defendant. | ) |

### SHAREHOLDER'S DIRECT AND DERIVATIVE COMPLAINT

Plaintiff Christopher Snyder ("Plaintiff") alleges as follows upon personal knowledge as to himself and his own acts, and otherwise upon information and belief:

## NATURE OF THE ACTION

1. This action is brought to address material disclosure violations permitted by the members of the Board of Directors ("the Board" or the "Individual Defendants") of Chesapeake Energy Corp. ("Chesapeake" or "the Company"), and to ensure that any damages suffered by Chesapeake by reason of these violations are borne by the Individual Defendants, and not by Chesapeake and its innocent shareholders.

2. Chesapeake, headquartered in Oklahoma City, is the second-largest producer of natural gas, a Top 15 producer of oil and natural gas liquids and the most active driller of new wells in the U.S. It is a public company with a large number of shareholders.

3. Chesapeake was co-founded in 1989 by defendant Aubrey K. McClendon ("McClendon"), who is presently Chief Executive Officer and Chairman of the Board. McClendon was the highest-paid CEO at all S&P 500 companies in 2008, receiving a compensation package totaling $112 million.

4. While McClendon owns roughly 1.35 million shares of Chesapeake stock (worth approximately $24 million), this interest is dwarfed by McClendon's personal investments in oil and gas wells being developed by the Company. Under an agreement unique among public companies in the oil drilling industry known as the Founders Well Participation Program (the "FWPP"), McClendon may purchase up to a 2.5% interest in wells being developed by Chesapeake. Each year, as provided by the FWPP, McClendon must elect to invest in all wells being developed by the Company, or no such wells. For at least ten years, and in every year since the FWPP was approved by the shareholders in 2005, McClendon has invested in every well. Because of large up front developments costs, McClendon's investments are significantly underwater, although this is expected to change as the wells mature.

5. The Company's Proxy Statements, its annual reports on Form 10-K and other SEC filings are required to detail all related party transactions, including all material details that may affect the FWPP, and all actual and potential conflicts of interest that may arise from McClendon's participation in the FWPP. The Individual Defendants, as directors and fiduciaries, are required to ensure that all such disclosures are full, accurate and complete, and that nothing is omitted that would make what is said misleading.

6. Unfortunately, on April 18, 2012 an exposé by the Reuters news agency shocked investors by revealing that McClendon (through companies he controls) had secured up to $1.1 billion in loans to enable him to invest in the FWPP, including as much as $500 million from EIG Global Energy Partners ("EIG"), a private equity firm heavily involved in financial dealings with Chesapeake overseen by McClendon. Such huge loans raise serious conflicts of interest: they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with EIG on financing terms. Indeed, upon revelation of the loans, some analysts opined that EIG's investors have received favorable terms from Chesapeake on recent financing deals. In addition to the above loans of such magnitude, which are secured by McClendon's interest in the various wells in which he has interests, may adversely impact Chesapeake and its business should they fall into default. Finally, they call into question whether the FWPP's stated goal of aligning the financial interests of McClendon with those of the shareholders (as was promised when the FWPP was approved in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments.

7. Reaction to the Defendants' failure ever to disclose and discuss these key matters was highly negative:

3

(a) David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, opined that "[g]iven the size, scope and complicated terms of the loans, their particulars constitute important stockholder information and therefore should be more fully disclosed";

(b) Joseph Allman, oil and gas industry analyst at JPMorgan in New York, who reviewed the loan agreements, said, "I think the company should disclose this information. One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing to Chesapeake. In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO."

8. In stock trading on April 18, 2012, Chesapeake shares plummeted $1.06 or 5.5%, representing a decline of over $500 million in market value. It is possible that the Individual Defendants have exposed the Company to class action securities fraud liability.

9. By this action Plaintiff seeks : (a) to require the Individual Defendants to disclose all material facts relating to the McClendon loans, and to discuss their actual and potential implications; (b) to establish a method of independent oversight regarding McClendon's borrowings, such the threats they may represent to the Company can be identified and addressed; (c) to rescind the FWPP as the purpose approved by the shareholders has been frustrated, as McClendon appears to have little or no true personal equity in the wells; and (d) to account to the Company for such damages as it has and will suffer as a result of their violations of law.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) insofar as the claims herein arise under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]. The Court also has jurisdiction under 28 U.S.C. § 1367 as to the state law claims pled herein, insofar as they arise out of the same transactions and occurrences as the federal claims.

11. Venue is properly placed in this District pursuant to 28 U.S.C. 1391(a) in that many of the violations alleged herein, including the dissemination of false and misleading proxy statements, occurred in this District.

12. To the extent that this action is brought derivatively, and is subject to Fed. R. Civ. P. 23.1, it is averred that this action is not brought collusively to confer jurisdiction on a court of the United States it otherwise would not have.

## THE PARTIES

13. Plaintiff owns Chesapeake shares, and has owned shares at all relevant times.

14. Defendant Aubrey K. McClendon has served as Chairman of the Board and Chief Executive Officer since co-founding the Company in 1989. From 1982 to 1989, Mr. McClendon was an independent producer of oil and natural gas.

15. Defendant Richard K. Davidson ("Davidson") has been a member of the Board of Directors since March 2006.

16. Defendant Kathleen M. Eisbrenner ("Eisbrenner") has been a member of the Board of Directors since December 2010.

17. Defendant V. Burns Hargis ("Hargis") has been a member of the Board of Directors since September 2008.

18. Defendant Frank Keating ("Keating") has been a member of the Board of Directors since June 2003.

19. Defendant Charles T. Maxwell ("Maxwell") has been a director of the Company since 2002.

20. Defendant Merrill A. Miller, Jr. ("Miller") has been a director of the Company since January 2007 and lead independent director since March 2010.

21. Defendant Don Nickles ("Nickles") has been a member of the Board of Directors since January 2005.

22. Defendant Louis A. Simpson ("Simpson") has been a director of the Company since June of 2011.

23. Nominal defendant Chesapeake is a public company engaged in oil and gas exploration and development. Its approximately 640 million shares trade on the New York Stock Exchange under the symbol "CHK." It is an Oklahoma corporation which maintains its executive offices at 6100 North Western Avenue, Oklahoma City, OK 73118. During the relevant period, it issued a Proxy Statement on April 29, 2011, and is expected to issue its 2012 Proxy Statement in late April 2012 in anticipation of a June 2012 annual meeting. No monetary relief is sought form Chesapeake.

## FACTUAL ALLEGATIONS

24. Chesapeake is the second-largest producer of natural gas, a Top 15 producer of oil and natural gas liquids and the most active driller of new wells in the U.S. It owns interests in approximately 45,700 producing natural gas and oil wells.

25. Defendant McClendon was a co-founder of Chesapeake in 1989, with Tom L. Ward (the "Founders").

26. In its early years of operations, the Company routinely sold leasehold interests in drilling prospects it had developed to the Founders and third parties rather than incurring the greater risk of developing the prospects through drilling. At the time of the Company's initial public offering in February 1993, the Company was retaining significant interests in the Company's prospects during the drilling phase, and the Founders were participating with the Company in its oil and gas wells. The Founders' participation program was first formalized and

incorporated into the Founders' employment agreements in connection with the IPO in February 1993. The Board believed the participation program aligned the interests of the Founders with those of the Company because the Founders were investing, and sharing the risks and rewards of drilling, on the same basis as the Company. The directors believed side-by-side participation encouraged the Founders to make decisions that would benefit the Company and its public shareholders. Participation was considered superior to non-cost bearing management incentives, such as overriding royalties or net profits pools that were frequently awarded by a number of the Company's competitors.

27. For each well in which a Founder participated, the Company or other operator billed the Founder an amount equal to his participation percentage multiplied by the drilling and operating costs incurred in drilling the well, together with leasehold costs in an amount determined by the Company to approximate the Company's average cost in all of the Company's acreage. Payment was due for such costs promptly upon receipt of an invoice. The Founder also received a proportionate share of revenue from the well, less certain charges by the Company for marketing the oil and natural gas production. The terms of the Founders' participation were represented to be no better than third party participants' terms in the wells.

28. The Founders have participated in all wells drilled by the Company, to the extent participation was permitted, from its initial public offering in February 1993 through 2005, except during the five quarters from January 1, 1999 to March 31, 2000.

29. In 2005, the Company formalized this arrangement by proposing shareholder approval of the FWPP. Under the FWPP, which was duly approved by a shareholder and which extends to 2015 for McClendon (co-founded Ward having left the FWPP in or about 2006):

    (a)     The Founders are permitted to participate in all of the wells spudded by or on behalf of the Company during each fiscal year;

 (b) A participation election by each of the Founders may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest, after elections by the Founders to participate, would be reduced to below 12.5%;

 (c) The Founders may not participate in (i) any well in which the Company owns an interest and has not elected to participate as a working interest owner with respect to such interest; (ii) any well which constitutes a re-entry of an existing producing well; (iii) any well drilled in a multi-unit secondary or tertiary recovery unit in which the Founders do not already have a working interest by virtue of participation in a well or well(s) that have been combined into the unit; and (iv) any other wells which the Company reasonably determines the Founders should not participate in given the objectives of the Founder Well Participation Program;

 (d) Once a Founder elects to participate, the percentage cannot be adjusted during the fiscal year without the prior written consent of the Compensation Committee; and

 (e) For each well in which a Founder participates, the Company will bill the Founder, on a monthly basis, an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well. Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. Payment is due for all such costs promptly upon receipt of an invoice.

 30. The Company did not at that time specify how the Founders would pay for the participation investments. The FWPP promised to align the Founders' financial interests with those of the Company and its shareholders.

 31. McClendon's personal financial issues have, in the past, been of great concern to shareholders, and have had an adverse effect on the stock. To increase his holdings in Chesapeake stock, McClendon borrowed money from his brokers, a practice known as buying on margin. In October 2008, with stock prices imploding, he was forced to sell more than 31 million Chesapeake shares for $569 million to cover margin calls from his brokers. The company's stock fell nearly 40 percent the week of McClendon's sales. McClendon issued an apology but the company's credibility with many shareholders suffered significantly.

Shareholders lawsuits arising from these events settled with a payment to the Company by McClendon, and certain new governance provisions that discourage speculative stock transactions in Chesapeake stock by Chesapeake executives.

32. In the wake of the events of 2008, McClendon sought a new (yet undisclosed) method of financing his speculations. In June 2009, McClendon agreed to borrow up to $225 million from Union Bank, a California lender, pledging his share of wells as collateral. In December 2010, he borrowed $375 million from TCW Asset Management, a private equity firm. And in January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners ("EIG"), a private equity firm formed by former TCW executives.

33. EIG, which has been involved in financing transactions done by Chesapeake, appears to have connections with McClendon that date back to 2009. As reported by Reuters on April 18, 2012, the details of the arrangement were detailed in minutes of a February 2011 meeting of the New Mexico Investment Council and EIG's Chief Operating Officer Randall Wade ("Wade"). The article recounts:

> "In fall 2008, Mr. McClendon didn't have liquidity to participate in the (well) program in 2009, at which point EIG entered into discussions with him" and ultimately formed a special purpose vehicle called Larchmont Resources, Wade said.
>
> Through Larchmont, EIG acquired the rights to all of McClendon's well stakes for 2009 and 2010. EIG then set up a new special purpose vehicle - Jamestown Resources - to control McClendon's well shares in 2011, with rights to 2012, Wade said.
>
> EIG's investments have been extremely profitable. "EIG sweeps 100 percent of the cash flow generated by those projects until EIG has gotten all of its money back plus a 13 percent realized return," Wade told New Mexico investors. EIG also gets a 42 percent cut of McClendon's share of the well profits "in perpetuity," he said.

34. Large investment banks and hedge funds such as EIG have been involved in many of Chesapeake's deals and volumetric production payments (VPP's) over the past few years. According to a an article posted on April 18, 2012 in the *Energy Policy Forum* entitled, "Loans May Not be the Only Worry at Chesapeake"[1]:

> Documents filed with the Second Circuit Court of Appeals disclose that Chesapeake Energy has structured VPP's in such a way that the sale and passing of title of reserve volumes is passed directly to the banks. The recorded conveyances confirm this. This, of course, provides the banks and hedge funds ownership status in the event of a Chesapeake bankruptcy. In short, because the banks own title to the covered assets, the reserves are no longer a part of the debtors estate in bankruptcy and therefore legal entanglement is avoided in paying creditors' claims. ***The banks and hedge funds now carry these assets on their balance sheets and Chesapeake has removed them from their balance sheet.***
>
> It is reasonable to assume that Chesapeake has structured most if not all these VPP's in a similar fashion. Therefore, foreign entities, such as the China Investment Corp. could also enjoy the same benefits....
>
> And yes, there is more. ***The court documents claim that Chesapeake has been overproducing wells in order to meet production targets of these banks.....***

35. It is no surprise that shareholders reacted with alarm when these tangled transactions were revealed. Such huge loans raise serious conflicts of interest: they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with EIG on financing terms. Indeed, upon revelation of the loans, some analysts opined that EIG's investors have received favorable terms from Chesapeake on recent financing deals. In addition to the above loans of such magnitude, which are secured by McClendon's interest in the various well in which he has interests, may adversely impact Chesapeake and its business should they fall into default. Finally, they call into question whether the FWPP's stated goal of aligning the financial interests

---

[1] Available at: http://energypolicyforum.com/?p=345

of McClendon with those of the shareholders (as was promised when the FWPP was approved in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments.

## DEMAND FUTILITY ALLEGATIONS

36. Counts II and III of this Complaint are brought derivatively, for the benefit of the Company. Demand upon the Board of Directors as to these Counts is and would be futile for the reasons that follow.

37. As to Count II, the Directors knew of or, in the exercise of diligence, would have known of the actual and potential conflicts of interest and the material facts concerning the McClendon loans detailed herein, and failed to disclose them. Given the strict liability or negligence standard applicable to liability under this Count, they stand a substantial likelihood of being held liable, and thus cannot independently evaluate a demand.

38. In addition, the omission of material information regarding related party transactions cannot be a reasonable exercise of business judgment, rendering such acts incapable of director ratification, and rendering demand upon directors who have acted in this matter excused as futile.

39. Finally, the directors have pre-judged this matter. Upon revelation of the adverse facts on April 18, 2012, the Individual Defendants authorized or acquiesced in Chesapeake's General Counsel asserting that no disclosures were or will be necessary, citing as authority a Delaware decision, *Beam v. Stewart,* a completely inapplicable precedent that had to do with a Board's lack of an obligation to monitor defendant Stewart's unlawful "tippee" trading in another company's stock, and which had nothing whatsoever to do with the defendant's conflict

of interest or related party transactions. Having made up their minds, the Individual Defendants cannot impartially consider a demand.

## COUNT I
### (Direct Claim for a Declaratory Judgment Under the Federal Proxy Laws)

40. Plaintiff repeats and realleges all previous allegations. This Count is brought directly, and not derivatively, against the Individual Defendants.

41. Under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated hereunder, the Individual Defendants had an obligation to ensure that any proxy statement issued by the Company contained information that is full, fair, accurate and not omissive in a way so as to make the information therein misleading.

42. The Company's April 29, 2011 Proxy Statement discussed the FWPP and McClendon's investment without also addressing the various attendant material facts concerning the loans and the conflicts of interest they entailed. This failure rendered that Proxy Statement materially omissive, false and misleading.

43. By reason of the foregoing, Plaintiff is entitled to a judgment that the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated, and awarded all declaratory, injunctive and monetary relief necessary to address and remedy this violation.

## COUNT II
### (Derivative Claim for Violations of the Federal Proxy Laws)

44. Plaintiff repeats and realleges all previous allegations. This Count is brought derivatively against the Individual Defendants for the benefit and protection of Chesapeake. This claim is brought in the alternative to Count I under Fed. R. Civ. P. 8(d)(2).

45. Under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated hereunder, the Individual Defendants had an obligation to ensure that any proxy statement issued by the Company contain information that is full, fair, accurate and not omissive in a way so as to make the information therein misleading.

46. The Company's April 29, 2011 Proxy Statement discussed the FWPP and McClendon's investment without also addressing the various attendant material facts concerning the loans and the conflicts of interest they entailed. This failure rendered that Proxy Statement materially omissive, false and misleading.

47. By reason of the foregoing, Plaintiff is entitled to a judgment that the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated, and awarded derivatively for the benefit of the Company all declaratory, injunctive and monetary relief necessary to address and remedy this violation.

## COUNT III
### (For Breach of Fiduciary Duty)

48. Plaintiff repeats and realleges all previous allegations.

49. The individual Defendants owe Chesapeake the highest duties of due care, loyalty and candor.

50. The foregoing duties required the Individual Defendants to ensure that Chesapeake released, disclosed, and discussed all material information necessary to protect the Company, and to fulfill its disclosure obligations. Here, defendants failed to act in good faith to fulfill their duties, and consciously disregarded their duties.

51. To the extent Chesapeake has or will be injured by these acts and failures to act, the defendants must account to the Company for these failures, and breaches of fiduciary duty.

52. Additionally, so as to avoid further harm to Chesapeake, defendants must be ordered to: (a) to disclose all material facts relating to the McClendon loans, and to discuss their actual and potential implications; (b) establish a method of independent oversight regarding McClendon's borrowings, such that the threats they may represent to the Company can be identified and addressed; (c) rescind the FWPP as the purpose approved by the shareholders has been frustrated, as McClendon appears to have little or no true personal equity in the wells; and (d) account to the Company for such damages as it has and will suffer as a result of their violations of law.

WHEREFORE, Plaintiff demands judgment as follows:

A. As to Counts I and II, declaring that Defendants have violated the federal proxy laws, and ordering all appropriate declaratory, injunctive and monetary relief flowing from these violations;

B. As to Count III, declaring that Defendants have breached their fiduciary duties, ordering them to account to Chesapeake for the damages it has accordingly suffered, and ordering them to affirmatively take the actions requested to remedy their breaches;

C. As to all Counts, an award of reasonable attorneys' and experts' fees and expenses; and

D. Such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

Dated: April 20, 2012

Respectfully submitted

*s/ Kenyatta R. Bethea*
Kenyatta R. Bethea OBA #18650
HOLLOWAY, BETHEA & OSENBAUGH
3035 N.W. 63rd Suite 102N
Oklahoma City, OK 73116
Telephone: (405) 246-0600
Facsimile: (405) 810-4080
kbethea@hbolaw.com

-and-

Nancy Kaboolian
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
nkaboolian@abbeyspanier.com

## VERIFICATION

I, Nancy Kaboolian, under pain and penalty of perjury under the laws of the United States, aver that I am counsel to plaintiff the Christopher Synder. I verify that I have reviewed the foregoing Shareholder's Direct and Derivative Complaint and that the allegations are true and correct to the best of my information, knowledge and belief. I am making this verification because the Plaintiff is not located in this judicial district.

*Nancy Kaboolian*
Nancy Kaboolian